The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Shuping. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award.
Plaintiff's motion for interest after the initial hearing pursuant to N.C. Gen. Stat. § 97-86.2 is hereby GRANTED. Plaintiff's motion for expenses on appeal, including attorney's fees, pursuant to N.C. Gen. Stat. § 97-88 is hereby DENIED.
* * * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
STIPULATIONS
1. Prior to hearing the parties entered in a Pre-Trial Agreement, which is incorporated by reference and where they agreed to a number of jurisdictional and other factual stipulations.
2. The depositions of Doctors Joyce, Hill and Kingery as well as the package of medical records attached to the November 15, 1995 correspondence of plaintiff's counsel are received into the evidentiary record.
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
FINDINGS OF FACT
1. Plaintiff is a right-handed, 35 year old divorced female, who did not have an antecedent history of neck, shoulder or arm problems prior to becoming employed by defendant-employer. She is a high school graduate and attended Central Carolina Piedmont Community College for two years taking nursing skills before stopping school to work full-time. While still in school plaintiff worked at Hardees. She was subsequently employed full-time by the Photo Corporation of America as a photo inspector for five and a half years until shortly after her marriage.
2. On August 29, 1983, plaintiff became employed as a repack order filler at defendant-employer's distribution center and worked in the same capacity until September of 1994 when she was no longer able to continue that type of work because of the occupational disease giving rise to this claim requiring her to be placed on modified duty. As a repack order filler she was responsible for packing merchandise in either boxes or containers for delivery to defendant-employer's retail stores.
3. Upon arrival at the distribution center in boxes from defendant-employer's vendors, the premises stockers would take the merchandise out of the boxes and place it on shelved racks in the repack area. Each rack had shelves ranging in height from approximately floor level to above plaintiff's head.
4. Although during her initial three years plaintiff primarily handled heavier clothing items that were located on the bottom shelves of the racks which did not require her to reach above shoulder level to obtain them, in 1986 she was assigned to health and beauty aids and worked there until developing her shoulder and arm problems in 1993.
5. In health and beauty aids, plaintiff handled such items as shampoo, medicines, tooth brushes, ball point pens and plastic ashtrays, whose weights ranged from several ounces for medicine to as much as seven pounds for cases of shampoo or plastic ashtrays.
6. For each order to be repacked plaintiff would receive a computer printout indicating the type and number of items to be pulled for the particular order. Plaintiff would pack the same orders in either boxes or containers, which she obtained from overhead hooks requiring her to reach overhead to obtain either the boxes, which were stacked one in another and weighed two pounds, or the containers, which were similarly stacked one inside another and weighed seven pounds, seven ounces. Plaintiff would then place either the box or container in which she was repacking the particular order on a 260 foot long conveyor belt with mechanical rollers and reach out to push the box or container along the same line as she walked down the three foot isle between the conveyor line and fifty racks from which she pulled the needed health and beauty aids. Once each box or container was loaded with a maximum of sixty pounds of merchandise plaintiff would push it off the mechanical line onto an automated conveyor line that delivered the repacked merchandise to another department. Once or twice per week plaintiff was also required to temporarily remove the boxes of merchandise she was packing off the conveyor line and then return them to it.
7. Plaintiff averaged packing approximately 250 lines of merchandise an hour, each of which would require her to twice reach onto the racks of health and beauty aids to obtain the needed merchandise resulting in her packing an average of 500 items of merchandise an hour, each of which she would obtain from the racks and turn placing them in the box or container being packed on the conveyor line and then turn back to the racks for another item. Plaintiff was not only required to reach 500 times an hour for items of merchandise, but in so doing had to frequently reach above shoulder level to obtain it from the racks' upper shelves.
8. The involved claim is one for disabling bilateral thoracic outlet syndrome, more severe on the left, due to the manner in which plaintiff had to repetitively reach and lift, frequently above shoulder level, to obtain needed merchandise in the course of her repack order filler's job, wherein, as compared to members of the general public and other employments at large, there is an increased risk of developing the same disease or condition.
9. Thoracic outlet syndrome occurs when either the nerves, or brachial plexus, or blood vessels that go into the arm are compressed as they pass through a tunnel formed on the top by the musculature of the shoulder, the bottom or floor by the rib cage, one wall or side by the clavicle and the other wall or side by the shoulder blade resulting in symptoms of compression of the same structures, including pain, weakness and numbness in the hands and arms, shoulders and neck as well as headaches and other symptoms.
Repetitive reaching and lifting regardless of the weight being lifted, particularly done above shoulder level, narrows or compresses the thoracic outlet or tunnel through which the brachial plexus and blood vessels exit to the arm and can cause thoracic outlet syndrome in an individual with a congenital anatomical narrowing of the thoracic outlet or tunnel when they are engaged in that activity for a number of years as plaintiff was as part of her regular repack order filler's job at health and beauty aids. Once the damage is done to the nerves, or brachial plexus, and/or blood vessels in the thoracic outlet an individual may continue to experience symptoms when they use their arms in any activity even after removal from the offending work environment requiring surgical decompression of the thoracic outlet when conservative treatment fails as similarly occurred in plaintiff's case.
10. Due to the above-described repetitive manner that she had to reach and lift, particularly above shoulder level on a frequent basis, in the course of her regular repack order filler's job in health and beauty aids for a number of years plaintiff has developed disabling bilateral thoracic outlet syndrome manifested by pain, numbness and weakness in her hands and arms, shoulders and neck as well as headaches.
11. Her symptoms began in 1993 with the onset of bilateral shoulder, arm and neck pain, which symptoms were worse at work and once they began progressively worsened. On December 30, 1993, she sought medical treatment from Dr. Thomas Friedrich, an orthopedic surgeon associated with the Carolina Bone and Joint Clinic in Monroe, who diagnosed an overuse-type problem attributable to her repetitive activities at work and recommended a conservative course of treatment, including physical therapy and medication.
12. When plaintiff notified defendant-employer of the probable work-related nature of her symptoms it referred to her the company physicians at Charlotte Miller Clinic and she was initially seen there on February 4, 1994 by Dr. David Mauerhan, who diagnosed a bilateral shoulder problem, partially attributable to her repetitive motions at work and similarly he provided a conservative course of treatment.
13. After seeing Dr. Mauerhan on two occasions plaintiff came under the care of Dr. David R. Kingery of the same clinic, who similarly diagnosed a shoulder problem, either shoulder impingement and/or rotator cuff tendinitis and similarly he attributed her condition to work.
14. Dr. Kingery initially prescribed a conservative course of treatment consisting of medication, physical therapy and work restrictions, including no overhead lifting. Although plaintiff returned to the modified work defendant-employer provided her picking up trash on the outside grounds, including tiny, minute truck seals, scrubbing flights of stairs in the warehouse and stair rails and picking up trash inside the warehouse; she continued to experience bilateral arm problems. Because of her persisting problems, Dr. Kingery further restricted her work activities and injected both shoulders with cortisone on several occasions.
15. Although the same course of treatment did significantly improve, but not totally eliminate, her right shoulder problems; it did not significantly improve her left-sided ones, which were the more severe of the two and have persisted resulting in her candidacy for decompression of the left brachial plexus.
16. In June of 1994, Dr. Kingery released plaintiff to return to regular repack order filler's job but when she continued to experience persisting left-sided problems and the functional capacity evaluation she underwent at his direction in September of 1994 indicated she was only capable of sedentary work, Dr. Kingery again restricted plaintiff to the modified work she began in September. The modified work to which plaintiff returned in September of 1994 not only consisted of the same type of modified work previously described picking up trash and scrubbing the stairway and rails, but a clerical job involving paperwork. Upon returning to modified work, she continued to experience significant persisting pain in her left arm and hand, shoulder and neck as well as similar right-sided symptoms to a lesser degree.
17. When Dr. Kingery did not recommend corrective surgery for the atypical shoulder impingement syndrome with which he ultimately diagnosed plaintiff, she returned to the Carolina Bone and Joint Clinic where she saw Dr. Jeffrey M. Dailey who did recommend shoulder surgery. Because of the conflicting opinions regarding the necessity of surgery plaintiff sought a third opinion from Dr. William Lyday who initially saw her on February 27, 1995 and diagnosed the bilateral thoracic outlet syndrome, more severe on the left side, that she had developed due to the repetitive reaching and lifting, frequently above shoulder level, required by her regular repack order filler's job. Thereafter, he referred her to Dr. Ronald Demas for electrical studies which confirmed her more severe left-sided thoracic outlet syndrome including the headaches that she had begun experiencing.
18. Dr. Lyday initially attempted a conservative treatment but eventually referred plaintiff to Dr. Dennis Hill for a neurological evaluation as well as back to Dr. Demas for one, each of whom similarly diagnosed bilateral thoracic outlet syndrome and recommended decompression of the more severely affected left brachial plexus in the event plaintiff's condition did not improve with a further course of physical therapy.
19. Plaintiff also sought a second opinion from another surgeon, Dr. Henry V. P. Wilson III and another orthopedic surgeon, Dr. Joseph J. Estwanick, both of whom concurred that she had developed thoracic outlet syndrome and was a candidate for decompression of the left brachial plexus because her condition had not improved with conservative treatment.
20. As the recommended decompression of the left brachial plexus is reasonably designed to tend to effect a cure, provide needed relief and/or lessen the period of disability associated with plaintiff's more severe left-sided thoracic outlet syndrome, defendants are obligated to provide the recommended surgery which plaintiff has apparently undergone since the hearing before the Deputy Commissioner.
21. During the period that she is unable to return to work while recovering from surgery plaintiff is also entitled to compensation benefits.
22. In the interim plaintiff has remained partially incapacitated by her thoracic outlet syndrome since February 7, 1994 because she has not been able to continue her regular repack order filler's job or been able to work any overtime but rather has primarily done modified work not involving any overtime entitling her to compensation based on two-thirds of the difference between her $482.82 average weekly wage at the stipulated February 7, 1994 date of injury and the $405.62 average weekly wage that she has been able to earn since because of the limitations of her bilateral thoracic outlet syndrome based on the stipulated Form 22 Wage Chart indicating her earnings during the year since February 7, 1994 or $51.47 per week.
* * * * * * * * * * * * * *
Based on the findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. Due to the manner in which she had to repetitively reach and lift regardless of weight, frequently overhead, for a number of years in the course of her regular repack order filler's job in health and beauty aids for defendant-employer plaintiff has developed disabling bilateral thoracic outlet syndrome, worse on the left, which disease or condition is due to causes and conditions characteristic and peculiar of her particular trade, occupation or employment, but excluding all ordinary diseases of life to which the public is equally exposed outside of their employment. Thus, plaintiff has developed a compensable occupational disease. N.C. Gen. Stat. § 97-53(13).
2. As a result of her occupational disease, plaintiff became temporarily partially disabled on February 7, 1994, the date of injury, entitling her to compensation at a rate of two-thirds of the difference between the $482.82 average weekly wage that she was able to earn at the time of her injury and the $405.62 average weekly wage that she has been able to earn since based on the stipulated Form 22 Wage Chart indicating her earnings during the one year since February 7, 1994 or $51.47 per week from February 7, 1994 to the scheduled hearing date before the Deputy Commissioner and thereafter continuing at the same rate until she ultimately stopped work to undergo surgery and became totally disabled. The parties may stipulate and agree to the date plaintiff was forced to stop working to undergo surgery which in his contentions plaintiff's counsel indicates was November 3, 1995. N.C. Gen. Stat. § 97-30.
3. During the period that she is totally disabled while recovering from her surgery, plaintiff is entitled to compensation at a rate of $321.90 per week commencing as of the date she stopped working to undergo corrective surgery, which date the parties can stipulate and agree and in his contentions plaintiff's counsel indicates was November 3, 1995, and thereafter continuing at the same rate so long as she remains totally disabled subject to a change of condition or further Order of the Commission. N.C. Gen. Stat. § 97-29.
4. Defendants are obligated to pay all reasonable and necessary medical expenses incurred by plaintiff as a result of the occupational disease including not only the left-sided brachial plexus decompression that she has undergone since surgery, but the medical evaluations and/or treatment she has received from Doctors Freidrick, Dailey, Mauherhan, Kingery, Lyday, Demas, Hill, Wilson and Estwanick to the extent reasonably designed to tend to effect a cure, provide relief and/or lessen the period of disability.
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
AWARD
1. Defendants shall pay plaintiff, including appropriate interest, on account of her temporary partial disability, compensation at a rate of $51.47 per week from February 7, 1994 and thereafter continuing at the same rate until she was forced to stop work to undergo corrective surgery, which date the parties can stipulate and agree and in his contentions plaintiff's counsel indicates was November 3, 1995 and thereafter commencing as of the date she was forced to stop working compensation at a rate of $321.90 per week for her resulting total disability and continuing at the same rate so long as she remains totally disabled, subject to a change of condition or further Order of the Commission. Such compensation as has accrued shall be paid in lump sum, without commutation, subject to a reasonable attorney fee hereinafter approved.
2. At this time a reasonable attorney fee in the amount of twenty-five percent of the accrued compensation benefits, not including interest, is hereby approved for plaintiff's counsel, which shall be deducted from the lump sum and forwarded directly to him. For the balance of his fee, defendants shall forward every fourth compensation check payable directly to plaintiff's counsel.
3. Defendants shall pay all reasonable and necessary medical expenses incurred by plaintiff as a result of the occupational disease which are reasonably designed to tend to effect a cure, provide needed relief and/or lessen the period of disability when bills for the same are submitted in accordance with approved Industrial Commission procedure.
4. Defendants shall bear the costs, including the expert witness fees previously Awarded Doctors Kingery, Hill, and Joyce for their deposition testimony to the extent they have not already been paid.
ORDER
In the event that either party is not able to stipulate and agree as to the date plaintiff was forced to stop working to undergo corrective surgery, the Full Commission is to be notified immediately.
 S/ _____________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
S/ _________________ J. HOWARD BUNN, JR. CHAIRMAN
S/ ______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER